```
                  UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF PENNSYLVANIA


RANDY L. DAVIS, JR.,          )  Case No. 2:23-cv-02004-KBH
                              )
              Plaintiff,      )  Courtroom 15A
                              )  U.S. Courthouse
v.                            )  601 Market Street
                              )  Philadelphia, PA 19106
VALLEY FORGE MILITARY         )
ACADEMY AND COLLEGE,          )
                              )  April 15, 2024
              Defendant.      )  11:08 a.m.


                 TRANSCRIPT OF MOTION HEARING
            BEFORE HONORABLE KELLEY BRISBON HODGE
             UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:           J. Stephen Woodside, P.C.
                             By:  J. STEPHEN WOODSIDE, ESQ.
                             425 Swede Street, Suite 605
                             Norristown, PA 19401


For Defendant:               Margolis Edelstein
                             By: CHRISTOPHER J. GILLIGAN, ESQ.
                             170 S. Independence Mall West
                             Curtis Center, Suite 400 E
                             Philadelphia, PA 19106


ESR Operator:                Jimmy Cruz

Deputy Clerk:                Leesa Ciamaichelo

TRANSCRIPTION SERVICE:       TRANSCRIPTS PLUS, INC.
                             435 Riverview Circle
                             New Hope, Pennsylvania 18938
                             Telephone:  215-862-1115
                             e-mail CourtTranscripts@aol.com


    Proceedings recorded by electronic sound recording, transcript
               Produced by transcription service.
```

1          THE CLERK:  All rise.  The United States District
2   Court for the Eastern District of Pennsylvania is now in
3   session.

4          The Honorable Kelley Hodge presiding in the matter of
5   23-Civil-2004, Davis, Jr. versus Valley Forge Military Academy
6   and College.

7          MR. WOODSIDE:  Good morning, Your Honor.

8          THE COURT:  Good morning; you all may be seated.
9   Good to see both of you this morning.  Counsel, if you don't
10  mind just introducing yourselves to me; this is the first time
11  that I think we've had the chance to meet.

12         MR. WOODSIDE:  Good morning, Your Honor, again.
13  Stephen Woodside, plaintiff's counsel for Randy Davis, Jr.

14         MR. GILLIGAN:  Good morning, Your Honor.  Christopher
15  Gilligan from Margolis Edelstein on behalf of defendant, Valley
16  Forge Military Institute and College.

17         THE COURT:  Good to meet you both.

18         Gentlemen, we're here at the request of defense
19  counsel who requested oral argument in this when the matter was
20  filed on a summary -- or rather, correction, motion to dismiss
21  12(b)(6) back in, I want to say, July of last year.  And since
22  it is the motion that has been made by defense, I'm going to
23  want to hear from you first.  And then, obviously, hear from
24  plaintiff's counsel.

25         I have read all the materials that you've provided in

1  terms of your briefs in support and the reply or responses

2  thereto.  And so I may have, obviously, questions for both of

3  you at certain points in time, but I would like to allow you to

4  go ahead and begin in order to go ahead and make me aware of

5  specifically what is the bases for your motion.

6          So, Mr. Gilligan, if you would like to start.

7          MR. GILLIGAN:  Thank you, Your Honor.  As you know --

8          THE COURT:  And you can move anywhere you choose.

9  You can move up.  You can stay there.  It is at your

10  discretion.

11          MR. GILLIGAN:  Okay.  We are here today on the

12  defendant's motion to dismiss the plaintiff's complaint for

13  failure to plead a claim of disability discrimination under the

14  ADA.

15          The defendant has never discriminated against the

16  plaintiff due to his diagnosis of MS, multiple sclerosis, and

17  has worked tirelessly to understand plaintiff's condition to

18  determine the best way possible to accommodate him, and help

19  plaintiff return to the workplace, to the extent that he felt

20  able.

21          Moreover, when plaintiff applied for long-term

22  disability, the defendant processed that application with their

23  carrier, and plaintiff has been receiving long-term disability

24  payments for over a year now.

25          I just want to give a brief recitation of the facts.

4

1   Plaintiff was initially hired by defendant as an assistant
2   professor in August of 2017.
3           In June of '22, plaintiff was diagnosed with MS.
4           On August 28th, 2022, plaintiff notified defendant
5   that he would need reasonable accommodations due to issues with
6   walking, sitting and standing, and extended hours.
7           On August 29th, 2022, Dr. Smith told plaintiff that
8   he and the HR Director, Penny Vander Wielen, would work with
9   him for the reasonable accommodation process.
10          On August 30th, 2022, the plaintiff's doctor provided
11  a brief note that his condition may make it difficult for him
12  to work, and asked him to be excused if symptoms arose.  The
13  complaint cites to this letter, quoting pieces of it at several
14  different times.
15          On September 8th, 2022, his doctor, plaintiff's
16  doctor prepared an FLMA certification that he could stand for
17  several hours a day and teach in person.  The certification, as
18  further described in the complaint, explained that he may need
19  a reduced schedule due to his ongoing symptoms.
20          The complaint discusses accommodations offered by the
21  defendant, such as ramps, a new classroom, and even his own
22  golf cart to get around the campus.  The HR Director asked
23  several times for additional information from the plaintiff to
24  help finalize the FMLA forms.
25          On September 26th, 2022, defendant received another

1 FMLA certification from his doctor that stated simultaneously

2 that plaintiff was able to perform all the functions of his

3 job, but he was also unable to perform any functions of his job

4 duties at that time, and that he would be incapacitated for a

5 single period from September 12th to December 22nd.

6        The very next day, on September 27th, 2022, the

7 defendant approved the plaintiff's FMLA request, and told him

8 to contact HR if he had any need for further accommodations

9 upon his return.

10       On November 17th, 2022, plaintiff contacted HR to

11 inform that he would be returning early, on November 21st, and

12 provided a doctor's letter clearing him to return.   The

13 complaint cites this letter, and notes that plaintiff may have

14 symptoms that impact his ability to work, and asks him to be

15 excused from work or be able to work remote.

16       Plaintiff's symptoms are not explained as to what

17 they are, the duration, the severity, what parts of his job he

18 could or could not perform, and why he would be able to perform

19 his job in full remotely rather than in person.

20       The very next day, on November 18th, 2022, the

21 defendant writes back to the plaintiff, asking for him to

22 provide necessary medical information concerning these symptoms

23 to help further the interactive process as the current

24 information provided was sorely lacking.

25       To further accommodate the plaintiff while waiting

1 for this information, defendant put him on paid leave and paid

2 him during this time period.

3        Prior counsel for plaintiff at the time agreed that

4 defendant was entitled to this necessary medical information

5 concerning plaintiff's symptoms as this would allow the

6 defendant to determine how to best accommodate him on his

7 return.

8        On November 29th, plaintiff provided a slightly

9 amended medical certification that, again, did not provide the

10 necessary information concerning his symptoms, duration,

11 severity, issues, that he would be able to complete or not

12 complete.

13        And, again, it did not go to the point as to why

14 plaintiff was able to do his entire job at home but unable to

15 do any of his work at the workplace.

16        THE COURT:  What did it say on November 29th, if it

17 didn't say what obviously your client was expecting and wanting

18 to hear?

19        MR. GILLIGAN:  So it just provided information as it

20 relates to that he would have ongoing symptoms, and I have --

21 it is one of exhibits, and that I'm happy to read the letter --

22  (Technical Difficulties/Off the record 11:14/Reconvene 11:19)

23        THE COURT:  Counsel, if you could, please state to me

24 in response to my question of what specifically was stated on

25 November the 29th of 2022.

1              MR. GILLIGAN:  Yes, Judge.  So the letter in full is

2     from a Dr. Matthew Schindler, it's dated 11/29 from Penn

3     Medicine.  It says, "To Whom It May Concern:  Randy -- Mr.

4     Randy Davis, Jr. is under my care at the University of

5     Pennsylvania, Department of Neurology.  Mr. Davis, Jr. is able

6     to return to work on 11/21/2022 with accommodations.  Mr. Davis

7     lives with multiple sclerosis, a chronic, progressive,

8     incurable condition that causes physical and cognitive

9     limitations, and is characterized by unpredictable exacerbation

10    of symptoms.  He experiences severe intermittent fatigue with

11    repetitive motor action, and sustained attention, paresthesias

12    in his feet, poor bladder control, and spasticity in his hands.

13    These symptoms come and go intermittently but are

14    chronic/lifelong.  Due to his medical condition, Mr. Davis, Jr.

15    is prone to develop symptoms which may temporarily impact his

16    ability to work.  We ask for him to be able to work remotely,

17    or be excused from work if these symptoms arise.  We believe

18    that accommodations will allow Mr. Davis, Jr. to perform all

19    job duties while maintaining a good quality of life."

20             THE COURT:  Repeat that last sentence again.

21             MR. GILLIGAN:  "We believe the accommodations will

22    allow Mr. Davis, Jr. to perform all job duties while

23    maintaining a good quality of life.  Thank you in advance for

24    your cooperation and compassion."

25             THE COURT:  And your statement a moment ago in your

1 argument was that this correspondence sent by the doctor to

2 your client was deficient in what way?  I think you said

3 duration, severity.  There were a few other things that you

4 articulated.  Can you repeat those again?

5          MR. GILLIGAN:  Sure.  So, again, as it relates to --

6 specifically, there were a couple issues in that we weren't

7 sure as to how often the symptoms would occur.

8          THE COURT:  It said intermittent, right?

9          MR. GILLIGAN:  It says intermittent.  But, again,

10 what -- to what degree of intermittent?  The first

11 certification that was provided said that he could work three

12 hours a day in person.  So that's what we were working off as a

13 baseline.  But now --

14          THE COURT:  When did you receive that correspondence?

15          MR. GILLIGAN:  That was prior to him going out on two

16 months of FMLA.

17          THE COURT:  So that was back in June, correct?

18          MR. GILLIGAN:  No, that was in September.  He went

19 out in September.  This is on his return now.

20          THE COURT:  Oh, okay.

21          MR. GILLIGAN:  And so we knew that he was able to

22 work in person just a month or two prior.  And we were trying

23 to determine, okay, well, what do "symptoms intermittent" mean?

24 Because now, the main focus here was all about plaintiff's

25 request to completely work remotely.  That's --

1          THE COURT:  Well, this didn't say that he could only
2    work remotely.  This said that he --
3          MR. GILLIGAN:  No, it --
4          THE COURT:  -- would have potentially intermittent
5    flare-ups, and that we would ask that reasonable accommodations
6    be provided in order to accommodate those flare-ups.  So the
7    time frame that the doctor provided was intermittent.  And he
8    did not say that he would be unable to work, but said he could
9    fully complete his duties if accommodations could be put into
10   place when flare-ups happen, at least that's what I read and
11   heard from you.
12         MR. GILLIGAN:  Sure.  So, I guess, again, it's a --
13   how you interpret this sentence, "We ask for him to work
14   remotely, or be excused from work if these symptoms arise."
15   And so we were trying to determine --
16         THE COURT:  It's a qualified statement.  It's
17   conditional, correct?
18         MR. GILLIGAN:  Right.  And so we were trying to
19   determine, well, when are these symptoms going to arise?  So we
20   have some idea that --
21         THE COURT:  When they flare up, right?
22         MR. GILLIGAN:  Right.  But what -- you know, again,
23   we're not dealing with a simple lifting restriction as to this
24   is "plaintiff cannot lift five pounds" or "plaintiff cannot
25   lift 50 pounds" or "plaintiff cannot walk up and down stairs."

1  We're trying to determine -- because, again, initially, he was

2  -- he had articulated to us he was having issues with his feet;

3  so we offered a golf cart.  Or he was having issues with the

4  location of his classroom; a new classroom was offered.  Right?

5  So this was -- and we interpreted, and this was consistent

6  throughout, is that plaintiff, and it -- and I believe it's --

7  that this is how it's cited and alleged in plaintiff's

8  complaint, that he only wanted to work fully remote.  He wasn't

9  talking about coming into the office at all.  So he was saying

10  his symptoms were ongoing all the time.  And that's --

11          THE COURT:  And when did he say that?  When was that

12  statement made?

13          MR. GILLIGAN:  I believe that part of that came from

14  our interpretation of the letter from a week prior, or two

15  weeks prior.  This is the 16th, and it's --

16          THE COURT:  Of what month?

17          MR. GILLIGAN:  Of November.  So this is when he was

18  able to return to work, and it says, "Mr. Randy Davis, Jr. is

19  under my care at the University of Pennsylvania, Department of

20  Neurology.  Mr. Davis, Jr. is able to return to work on

21  11/21/22 with accommodations.  Due to his current condition,

22  Mr. Davis, Jr. is prone to develop symptoms which may

23  temporarily impact his ability to work.  We asked for him to be

24  able to work remotely, or be excused for work if these symptoms

25  arise."

1           THE COURT:  And --

2           MR. GILLIGAN:  And so we sent a letter asking for

3   additional information about the symptoms.

4           THE COURT:  And that's what you received on the 29th.

5           MR. GILLIGAN:  And that's what we received on the

6   29th.

7           And in response to same, we sent a letter on December

8   6th asking for -- trying to determine the requested

9   accommodation as to be able to work remotely.  Because we were

10  unsure of when, again, he would actually need to work remotely.

11  I understand it says flare-ups may occur but, again, there's

12  still some ability by the doctor to either say they're going to

13  happen every single day, or they're going to happen once a

14  week, or they're going to happen a couple times a month.  There

15  has to be more information that the doctor can provide to us.

16          THE COURT:  Why does there have to be more

17  information?  Why is the information provided not sufficient?

18  That's my struggle.

19          MR. GILLIGAN:  I think it's from -- a question from

20  the school is if he is going to say that he may not be able to

21  work at all, which is one of the requested accommodations, how

22  is the school supposed to be able to provide coverage for his

23  classes?  He's the one teaching classes, multiple classes to

24  different students.  If -- and this is the whole part of the

25  interactive process, to determine whether or not we can provide

1 | reasonable accommodations to him to allow him to be able to
2 | stay in his condition -- or in his position.

3 |      If he's unable to perform the basic job functions
4 | that he was hired to do, then it's not a reasonable
5 | accommodation because we'd be required to hire a whole new
6 | professor to take on the plaintiff's role.

7 |      THE COURT:  Well, I know you said a few times that
8 | this is how you interpreted it, meaning your clients
9 | interpreted it, the correspondence that you provided.  And I
10 | know that a large crux of this argument that I expect to hear
11 | today from you, as well as from opposing counsel, is on the
12 | extrinsic evidence issue, and what was or was not integral for
13 | the Court in terms of what I can consider in a 12(b)(6).  And
14 | not taking this particular argument or this motion and
15 | converting it into something it is not, and cannot be, and
16 | should not be, which is a Rule 36 summary judgment, which the
17 | Court is not willing to do.

18 |      So you provided in your argument, in your brief
19 | information regarding what your client interpreted these
20 | various correspondence to be.  I'm not saying at this point
21 | that I am or I am not considering it as extrinsic evidence.
22 | I'll define that when I render my ruling following these
23 | arguments.

24 |      But for the sake of what we are engaging in this
25 | morning and hypothetically speaking, if I do consider this

1  information or evidence, how is it that what was stated that

2  you just read to me on the November 29th correspondence

3  insufficient?

4          MR. GILLIGAN:  I believe that under the ADA,

5  specifically for an interactive process, the parties are able,

6  especially the defendant, is able to ask for medical

7  information it feels that is necessary to make determinations

8  on reasonable accommodations.

9          THE COURT:  Fair enough.

10          MR. GILLIGAN:  And I believe that that is

11  specifically what was happening and ongoing here.  As, you

12  know, again, the requests were coming in, the defendant, you

13  know, this is around Thanksgiving of that time period, was

14  quickly trying to provide, and respond, and determine what

15  accommodations could be made.

16          And frankly, I think, again, as I mentioned before,

17  this is not a very easily defined disease.  I think that's

18  clear.  This is a very complicated disease.  This is not a

19  simple lifting or walking restriction.  This is trying to

20  determine what extent the plaintiff could do his job while

21  being diagnosed with a horrible disease that has both cognitive

22  and physical issues associated with it.  And so --

23          THE COURT:  Would you agree that the doctor, who is a

24  neurologist, gave you, based on his expertise, neither of which

25  you don't have, nor I don't have, nor opposing counsel has, his

1 medical conclusion as to what the definition of MS is, and how

2 it manifests itself generally and specifically as to this

3 particular plaintiff/his patient, and informed you of such?

4 And that the interactive process that your client, you state in

5 your brief, was refusing to engage in, he was engaging in by

6 providing the information that he thought he needed to give you

7 from his physician; he could not diagnose himself.  And to tell

8 you, "Well, this is what I have.  This is what it means.  I

9 can't give you any specificity about how frequently it will

10 arise.  It is intermittent.  It is based on a variety of either

11 physical and/or external things that could trigger a heightened

12 need of pain, or a need for treatment, or a need for -- to be

13 sedentary, or whatever the needs are."  And that's something

14 that the doctor couldn't give you.  Because if he could say

15 once a week, every Monday at, you know, noon, he's going to go

16 ahead and have a flare-up, he would say, well, that's what's

17 going to happen.  But he couldn't do that.  That's not

18 reasonable, wouldn't you agree?

19        MR. GILLIGAN:  Well, I think that I would agree that

20 the doctor provided an example of symptoms that the plaintiff

21 was experiencing.  But I don't think that he fully provided as

22 much detail as he could in this one sentence as it relates to

23 the symptoms.  And I believe that the defendants realized that,

24 and we understood what was being asked.

25        And so what we did was we sent this December 6th

1  correspondence asking, "Hey, let us talk to your doctor to try

2  to figure out what accommodations we can provide you with."

3  And I think that that was the compromise, because, again, this

4  is the interactive process.  We're allowed to talk to the

5  medical professionals and get this additional information.

6          And so -- and that's what we asked for.  Because,

7  again, it doesn't seem clear how you would be able to manage a

8  company if employees, especially suffering the conditions that

9  he is going from, are simply unable to work completely,

10  unpredictably, every day of the week.  That would not be a

11  reasonable accommodation anymore.  Now you're --

12          THE COURT:  But he wasn't asking for that.

13          MR. GILLIGAN:  Well, I think that that's -- that is

14  specifically what he was asking for.  He's asking to be able to

15  work remotely, or not show up to work at all.  And it's unclear

16  -- so I think maybe the better question is, why would he be

17  able to do his job at home if symptoms arose?

18          THE COURT:  And --

19          MR. GILLIGAN:  I think that's the key part.

20          THE COURT:  And the answer to that, at least at this

21  stage, which is the pleading stage because, again, we're not

22  getting into the summary judgment stage so we're not

23  determining this case on its merits, but at the pleading stage.

24  While you have provided the additional information, and took

25  exception to the fact that the plaintiff did not provide kind

1  of a comprehensive medical history of himself when he filed his
2  pleading, what was just stated by you with the November 29th
3  correspondence, "chronic, progressive, incurable condition that
4  causes physical and cognitive limitations, and is characterized
5  by unpredictable exacerbation of symptoms.  He experiences" --
6  "he," meaning the plaintiff specifically, "severe intermittent
7  fatigue with repetitive motor action and sustained attention,
8  paresthesias in his feet, poor bladder control, and spasticity
9  in his hands.  These symptoms come and go intermittently but
10 are chronic and lifelong."

11        We have duration.  We have diagnosis.  We have what
12 is specific to him, not just general.  And that particular
13 correspondence was interpreted by your client as being -- and
14 the next sentence that follows, "The certification also
15 included progress notes that left the defendant with more
16 questions than answers."  Therefore, the conclusion to the
17 Court, based on your brief, is that what was provided was not
18 only insufficient, but left you with more questions as to what
19 he could or could not do than answers as to what he could or
20 could not do and when.

21        MR. GILLIGAN:  I think the issue, again, Your Honor,
22 as -- is that I'm -- and I'm trying to articulate it, at least
23 from our perspective, was, okay, we have these symptoms.  I
24 understand Your Honor's point about maybe the unpredictable
25 nature, at least what the doctor had provided, okay.  And I

1  think from our perspective is that, okay, we have -- we know

2  what the symptoms are, why is he able to work remotely if he

3  still has all these symptoms?  And that's what we were trying

4  to get through and determine as part of the interactive

5  process.

6         THE COURT:  Okay.  And so based upon -- I think,

7  depending on the nature of the symptoms and how they displayed

8  themselves on any given day, the request was that he be allowed

9  to work remote.  Because it seems like the remote work is the

10 true issue here, and that he be allowed to work remotely or not

11 work at all, depending on how severe the symptoms manifested

12 themselves.  He could have weeks -- days and weeks where he was

13 perfectly fine.  And then he could have a period of maybe three

14 or four days, or two weeks where he's not fine, but he's able

15 to do what he can do, meaning being mobile and being able to

16 get from point A to point B, in a remote setting as opposed to

17 an in-person setting.

18         MR. GILLIGAN:  Well --

19         THE COURT:  That's my impression of what is stated

20 based on the physician's submission and what is gleaned through

21 my reading of both briefs.

22         MR. GILLIGAN:  Yes, Your Honor.  And, again, I think,

23 again, it's that last point, though, is why, if these symptoms

24 occur, is he still able to do his job at home?  Why is -- why

25 are those symptoms --

1            THE COURT:  Because he feels well enough to.

2            MR. GILLIGAN:  But they -- okay.  But that's --

3   that's the question that we're trying to determine as part of

4   the interactive process.  Why are you able to do those things

5   at home?  And all we needed from him --

6            THE COURT:  Because he feels well enough to.  Like,

7   you may not like the answer, but it doesn't change the fact

8   that his physician has told you as such, and he is telling you

9   as such.  And so it sounds like there's an issue from your

10  client's vantage point with just not either, A, liking the

11  answer, or believing what the plaintiff is saying.

12           MR. GILLIGAN:  Well, I --

13           THE COURT:  But I'll let you finish your argument

14  because I'm definitely interrupting you with frequency.  But

15  these are the things that are a bit perplexing to me.  Please

16  tell me about the extrinsic evidence and why I need to consider

17  these things that I've said at the outset, hypothetically, I'm

18  not inclined to consider because I don't think it's warranted

19  on a 12(b)(6) motion.

20           MR. GILLIGAN:  Sure.  And I think, again, you know,

21  as it relates to whether or not we were believing, or what

22  information we were seeking, I think, again, you have to take

23  into context what had previously happened.  That he had been

24  out for two months, wasn't able to complete any job duties at

25  all.  So we're not talking about him being able to come into

1  work at any point, but now he's perfectly fine, and is able to

2  return in person.  I think, again, that kind of -- it just kind

3  of conflicts.

4        But I will move on to the next piece of this, which

5  is, again, a little bit of the extrinsic evidence because I

6  think this is where the plaintiff's complaint and some of the

7  extrinsic evidence that he believe is integral show up.  In

8  that we did ask on December 6th, and December -- December 20th,

9  and, again, on January 18th for more information to help us

10 determine what we could do to help the plaintiff.

11       In a response to same, we were told this was a

12 fishing expedition, which, you know, Your Honor has -- you

13 know, has kind of pointed to in terms of, well, how much

14 information do you need?  But, again, this was the defendant's

15 view of engaging in the interactive process.  We were

16 continuing to try to ask questions, and we did so through three

17 separate different letters.

18       THE COURT:  And he was engaging in the interactive

19 process, correct?  You agree with that.

20       MR. GILLIGAN:  Previously, but then he stopped.

21       THE COURT:  When?

22       MR. GILLIGAN:  He never responded to the December

23 6th, the December 20th, and the January 18th letter.

24       THE COURT:  And so because he didn't respond to those

25 letters, up to that point, you would agree he engaged in the

1  interactive process.

2     MR. GILLIGAN:  I would believe that there was

3  engagement, yes, back and forth.  Or communications, at the

4  very least.

5     THE COURT:  And suffice it to say, I'll leave it to

6  counsel to argue.  But I would suspect that the argument is "we

7  engaged in it as much as we could, and didn't have anything

8  more to provide.  We thought we provided it all."  So

9  hypothetically, if that is counsel's argument, what would you

10  say to that?

11     MR. GILLIGAN:  I mean, I would say that specifically,

12  that that's not what the complaint pleads.  It says the college

13  never responded or followed up with the plaintiff to address

14  Dr. Schindler's letters.  And I just pointed to three separate

15  letters that were all in response to the plaintiff and those --

16  and Dr. Schindler's letter.  So that is the biggest issue that

17  I have in terms of what this ongoing interactive process,

18  because the -- the complaint would lead you to believe that

19  none of these additional follow-ups occur.  And that's, again,

20  specifically what's pled in the complaint, the college never

21  responded, never responded or followed up with plaintiff to

22  address Dr. Schindler's letters, and never offered and, in

23  fact, refused the remote virtual work accommodation recommended

24  by Dr. Schindler and requested by the plaintiff.

25     THE COURT:  Well, did your client refuse the remote

21

1  work accommodations?

2          MR. GILLIGAN:  No.

3          THE COURT:  Did your client grant the remote work

4  accommodations?

5          MR. GILLIGAN:  We were sending -- we sent three

6  additional letters to determine whether or not the remote -- he

7  needed the remote accommodations.

8          THE COURT:  That's not my question.  Did your client

9  ever grant the remote work accommodations?

10          MR. GILLIGAN:  At the time, because the interactive

11  process was ongoing, there was -- no determination was made.

12          THE COURT:  That is correct.  The interactive process

13  was ongoing.

14          MR. GILLIGAN:  Right.

15          THE COURT:  Okay.  Go ahead.

16          MR. GILLIGAN:  And shortly thereafter, and as we

17  received no response to any of our letters, the plaintiff

18  applied for and received long-term disability through the

19  school.  And then from there, the EEOC charge and this

20  complaint followed.

21          But now, as Your Honor mentioned, she would like to

22  discuss the documents that we relied on for our narrative,

23  which we believe should be reviewed as they're integral on a

24  12(b)(6).  You know, as we discussed, generally courts are only

25  allowed to consider the allegations in the complaint, exhibits

1    attached to the complaint, and matters of public record.

2    However, an exception to the general rule is that a document

3    integral to or explicitly relied upon in the complaint may be

4    considered without converting the motion to dismiss into one

5    for summary judgment.  The rationale underlying this exception

6    is that the primary problem raised by looking to documents

7    outside the complaint -- lack of notice to the plaintiff -- is

8    dissipated when the plaintiff has actual notice and has relied

9    upon these documents in framing the complaint.  And this is

10   citing to Schmidt v. Skolas, 770 F.3d, 241, Third Circuit 2014.

11            The court in Schmidt further stated, quote, "The

12   justification for the integral documents exception is that it

13   is not unfair to hold a plaintiff accountable for the contents

14   of documents it must have used in framing its complaint, nor

15   should a plaintiff be able to evade accountability for such

16   documents simply by not attaching them to his complaint."

17            In this particular case, all the documents, the

18   exhibits that were provided, plaintiff and plaintiff's counsel

19   had noticed of them.  These are the plaintiff's medical

20   records.  These were letters that were sent and received by

21   them, and should be considered in that there was no lack of

22   notice to the plaintiff.  They had -- there was no surprise and

23   they were able to review and see each of these documents

24   previously, not before --

25            THE COURT:  What requires that they be attached?

1  They get to file their complaint and base it on -- articulate

2  it how they see fit and in the strongest posture that they're

3  able to do so.  You're not saying that the filing is

4  insufficient or deficient in a way that it's not noticing you

5  and providing you with sufficient information to defend.  It's

6  just it doesn't contain the full scope of everything that you

7  believe it should contain and, therefore, it misrepresents, am

8  I correct?

9          MR. GILLIGAN:  Yes.  But under the integral documents

10 exception, when documents are used and based off of for the

11 complaint, these are the type of documents that are allowed to

12 be considered on a 12(b)(6).  And in this case, with the

13 narrative that was given, and the communications that were left

14 out, and the medical information that was, again, included, the

15 complaint specifically cites to certain -- to some of the

16 documents that we provide.  It quotes them in certain places.

17 It provides a general narrative.  And then, again, it provides

18 an untruthful narrative by just -- by stating that there was no

19 further response when that's simply not the case here.  There

20 was three separate letters, and there's no way that the

21 plaintiff is able to put that in his complaint without

22 specifically disregarding that correspondence.

23         THE COURT:  Well, how is that relevant, though, at

24 this stage with a 12(b)(6) on the filing of the complaint, and

25 not more appropriate after discovery has taken place, there's

1  been questioning throughout the course of depositions, and

2  cross-examination that's conducted, and then that's something

3  that would be potentially more appropriate, if not more viable,

4  at a summary judgment stage?

5          MR. GILLIGAN:  Because, again, we believe that these

6  documents that were provided in our motion to dismiss are

7  permitted to be reviewed as they're integral to the plaintiff's

8  complaint.  I mean, Your Honor's correct that these documents

9  could be viewed at a later time, but we don't see any reason

10  now why they cannot be considered as, again, the Court stated

11  that, you know, plaintiff should be -- not be able to evade

12  accountability simply just by not attaching them to his

13  complaint.  And in this -- and in this case, the documents are

14  specifically relied upon.

15          THE COURT:  And I think to your point, can you

16  explain to me the posture that you make in your response brief,

17  which is your ECF 7, that states that if I were to take the

18  position of ruling in favor of the plaintiff, and thereby

19  denying your motion, that I would take part in a charade where,

20  though having the indisputable facts of the case before me, I

21  would pretend that sometime later at a later date that another

22  version of events could exist, and somehow I would be complicit

23  in a charade, can you explain that?

24          MR. GILLIGAN:  Sure.  Again, this goes back to the

25  specific allegation in plaintiff's complaint, which is that the

1  college never responded or followed up with the plaintiff to

2  address Dr. Schindler's letters.  Your Honor knows that not to

3  be true.  And the plaintiff's opposition doesn't even deny that

4  that's -- that that's not a false statement.

5          I mean, what we have here is a factual

6  misrepresentation in the complaint that's demonstratively so

7  with the multiple examples that we've provided.  And to ignore

8  that, I believe --

9          THE COURT:  I would be complicit in engaging in a

10  charade if I rule against you, correct?

11          MR. GILLIGAN:  I believe that -- well, maybe not as

12  strong as that, Your Honor.  I believe --

13          THE COURT:  Well, that's what your words are.

14          MR. GILLIGAN:  I believe that it's -- I think that

15  it's very hard to ignore that that's a factual

16  misrepresentation in the complaint.  And I would --

17          THE COURT:  Well, facts are always in dispute in a

18  complaint.  I mean, you argue one side, somebody argues the

19  other side, you know, and that's the purpose of litigation.  Am

20  I correct?

21          MR. GILLIGAN:  That is correct.  But I believe that

22  based off of the integral documents that we provided allows

23  Your Honor to see the clear picture and motion that -- or

24  narrative as it relates to what truly transpired.

25          THE COURT:  Well, let's suppose, for sake of

1  argument, that I see your clearer picture and contemplating

2  these particular documents.  And let's say the clearer picture

3  that you want for me to see, which may have equal levels of

4  cherry-picking.  I did not use "fishing expedition," that was

5  counsel's word.  But to some extent some cherry-picking, let's

6  just say, that you may have engaged in because you want me to

7  focus on this based on your interpretation or your client's

8  interpretation, and let's say that the Court disagrees with it

9  and says, "well, there's an alternative interpretation," and so

10 it's not as crystal clear as you may purport it to be.

11         MR. GILLIGAN:  I believe that in this particular case

12 as it relates to allegation 59, it's crystal clear, and that

13 the plaintiff is alleging specifically that the college never

14 responded, and I think that is demonstratively false.

15         And I think as, you know, whether or not the

16 substances of those responses are argumentative, or from a

17 differing viewpoint, as plaintiff's counsel points out.  But I

18 don't think that there's any dispute that those letters were

19 sent, and that plaintiff's November 29th -- Dr. Schindler's

20 letter was responded to.  I don't think that's a dispute.

21         THE COURT:  And so following the November 29th, 2022

22 correspondence from the plaintiff's treating physician, you

23 stated there were three separate occasions after that where

24 your client asked for -- was it more information?  Is that what

25 they wanted?  Greater clarity on December 6th, and another date

1  in December, and a date in January, am I correct?

2          MR. GILLIGAN:  Essentially, yes, Your Honor.

3          THE COURT:  Okay.  And those particular emails or

4  outreaches by your client were not responded to by the

5  plaintiff, correct?

6          MR. GILLIGAN:  The only response was in relation to

7  the -- was a couple of -- was in between.  So after the first

8  two, there is a response by the plaintiff that said, "we

9  believe this is a fishing expedition.  We're filing our EEOC

10 charge."

11         And even after that, in January, the defendant sent

12 another letter asking for this medical information, again to

13 try to continue what they believed to be their ongoing

14 obligation under the interactive process to engage in good

15 faith.  And so that they continued to try to reach out even

16 when the plaintiff said that we're not going to give you more

17 information.

18         THE COURT:  And I will wait to hear from counsel in a

19 moment, but let's just say for the purposes of this, they will

20 not dispute, and I will not ignore to the extent that I'm

21 considering things that may be deemed extrinsic, that there

22 were three communications following November 29th that were not

23 responded to by the plaintiff.  The content of those

24 communications is what it is.  Whatever was contained in there,

25 there was no response back.

28

1          So that does not negate the fact, to your point, that

2    there were communications by your client to the plaintiff to

3    try to continue what had already been started as the

4    interactive process that you concede that the plaintiff was

5    engaging in with your client.

6          MR. GILLIGAN:  Correct.

7          THE COURT:  Am I right about that?

8          MR. GILLIGAN:  Yes.

9          THE COURT:  The exception that you take and that your

10   client takes, or you're making on behalf of your client is that

11   because there was no ongoing interactive dialogue in order to

12   flush out or further define the needs and accommodations beyond

13   what was stated in the November 29th correspondence from his

14   doctor, that, in essence, there was nothing more that you all

15   could do.

16         MR. GILLIGAN:  I think from our perspective as it

17   relates to the interactive process and determining what

18   reasonable accommodations could be offered to the plaintiff,

19   no.

20         THE COURT:  And so since that time, the plaintiff has

21   been on long-term disability, and so I'd like for you to just

22   tell me a little bit about whether or not you see what, if any,

23   harm he has suffered being placed on long-term disability.  Or

24   do you think that absolves you of a claim under the ADA because

25   he has, in essence, not had a negative consequence as a result

1  of his status as being an individual who is disabled?

2         MR. GILLIGAN:  So I think there's a couple of

3  different points there, and I'll try to address them as I can.

4  I think that, one, I would argue as it relates to an adverse

5  employment action.  We did not seek to place him on long-term

6  disability.  The plaintiff sought to put himself on long-term

7  disability.  We approved -- we helped process the application,

8  which was approved by the disability carrier.

9         So from our perspective, we never terminated him or

10 ended the reasonable accommodations discussion.  It was the

11 plaintiff that said "I am unable to work in any capacity and I

12 need to go on long-term disability," which we helped

13 facilitate.

14        THE COURT:  And so from your position, your client

15 says that he is still, in essence, employed or on the payroll

16 for Valley Forge, correct?

17        MR. GILLIGAN:  It's my understanding that he

18 continues to receive long-term disability payments up until

19 this date.

20        THE COURT:  Okay.

21        MR. GILLIGAN:  As it relates to specifically the

22 claim for disability discrimination in the complaint, I think

23 that we have addressed -- and which we interpret either as both

24 a failure to accommodate and simply as disability

25 discrimination.  I think we've discussed the failure to

1    accommodate piece, a lot of -- pretty much in full.

2           Again, we do not believe that the plaintiff is able

3    to meet certain prongs of the prima facie case.  Specifically

4    that -- to show that the defendant did not make a good faith

5    effort to engage in the interactive process.  We believe that

6    the communications throughout that are cited in the plaintiff's

7    complaint, and then thereafter which were purposely excluded,

8    show that we did engage in good faith, and he'll never be able

9    to show that there was any lack of good faith on our part.

10          And, number four, again, which is that the plaintiff

11   could have reasonably been accommodated but for the defendant's

12   lack of good faith.  We believe, again, that there was no bad

13   faith on our behalf, and it's unclear to us whether the

14   plaintiff actually could have been reasonably accommodated in

15   his position because of his refusal to engage anymore in the

16   dialogue as it relates to why he was able to work at home

17   versus why he would have been able to or not be able to come

18   into the workplace.

19          And I think it's important to note a couple of cases

20   specifically, Ruggiero versus Mount Nittany Medical Center,

21   which is 736 F. App'x 35 Third Circuit --

22          THE COURT:  F?  I'm sorry.

23          MR. GILLIGAN:  Sure.

24          THE COURT:  Repeat the cite.

25          MR. GILLIGAN:  It's Ruggiero versus Mount Nittany

1  <u>Medical Center</u>, 736 Federal Appellate 35 Third Circuit 2018.

2  And that specifically states "Both parties bear responsibility

3  for determining what accommodation is necessary.  Neither party

4  should be able to cause a breakdown in the process for the

5  purpose of either avoiding or inflicting liability.  Rather,

6  courts should look for signs of failure to participate in good

7  faith or failure by one of the parties to help the other party

8  determine what specific accommodations are necessary.  A party

9  that obstructs or delays the interactive process is not acting

10 in good faith.  A party that fails to communicate, by way of

11 initiation or response, may also be acting in bad faith.  In

12 essence, courts should attempt to isolate the cause of the

13 breakdown and then assign responsibility."

14          And I think lastly, as it goes to the type of

15 accommodation requested by the plaintiff, the ADA does not

16 require an employer to provide the specific accommodation

17 requested by the employee.  Here in this particular case, the

18 plaintiff was seeking remote leave.  We were seeking to have

19 him come to the office, and offered many accommodations,

20 whether it be a golf cart, a new classroom, ramps.  We --

21          THE COURT:  Did you offer him an office?

22          MR. GILLIGAN:  A new classroom, yes.

23          THE COURT:  No; is that his office?

24          MR. GILLIGAN:  I think it's -- I think we -- I

25 believe we did, but I do not believe that we specifically cited

1  to it in the -- in our responsive briefs.

2          THE COURT:  Okay.

3          MR. GILLIGAN:  I think that, again, there was -- one

4  of the email communications that we did provide discusses that

5  she went -- that the head of HR, Ms. Penny Vander Wielen, went

6  to discuss with the plaintiff changes to his office, and his

7  classroom, and his schedule, but that he had left early that

8  day.  And that was in September, right before he was out for

9  two months.

10          Again, during this process when we were seeking more

11  information about the ability of the plaintiff to work and

12  determine what reasonable accommodations were given, we gave

13  him paid leave to allow him to try to get additional time to

14  get this information to us.

15          Again, the defendants were working as hard as they

16  possibly could in offering these different accommodations to

17  the plaintiff.  And we believe that the plaintiff is the one

18  that caused the breakdown in communications here.

19          As it relates to the prima facie case of disability

20  discrimination under the ADA, we believe that, again, the

21  plaintiff will suffer in being able to show Prong 2 or Prong 3,

22  that he was otherwise qualified to perform the essential

23  functions of his job with or without reasonable accommodations

24  by the employer, and that he suffered an otherwise adverse

25  employment action as a result of discrimination.

1          THE COURT:  You believe he is not able to meet those

2 two prongs, correct?

3          MR. GILLIGAN:  That's correct.

4          THE COURT:  Okay.

5          MR. GILLIGAN:  Specifically, we do not believe he can

6 meet Prong 2 as he is not qualified for the position.  As

7 plaintiff is on long-term disability and unable to work, he is

8 not a qualified individual per <u>Severson</u>.

9          THE COURT:  Wasn't he qualified when he was hired for

10 the position?

11          MR. GILLIGAN:  According -- under the ADA, and there

12 is case law to support that it is not an open-ended leave

13 statute.  And so that if he is unable to work, that he can no

14 longer be a qualified individual as it relates to whether or

15 not he could be able to perform the position.

16          THE COURT:  So are you saying that he is no longer

17 qualified for the position because of his multiple sclerosis?

18          MR. GILLIGAN:  I'm saying that he is no longer

19 qualified for his position because he is on long-term

20 disability and unable to work in any capacity.  And that's

21 according to <u>Severson versus Heartland Woodcraft, Inc.</u>, which

22 is 872 Federal 3d 476, which is a Seventh Circuit case.  And

23 specifically in that case --

24          THE COURT:  What year?

25          MR. GILLIGAN:  2017.  And specifically in that case,

1 the court found that under the ADA, "An employee who needs

2 long-term medical leave cannot work and is, thus, not a

3 qualified individual."  Again, this goes to the integral

4 document exemption as it relates to the Unum long-term

5 disability documents that we provided.  We believe that, again,

6 plaintiff's allegations that he is able to work to be -- to

7 allow -- carefully allow plaintiff to disregard the Unum

8 documents showing that plaintiff is on long-term disability and

9 unable to work.

10         Again, we don't believe that plaintiff can meet Prong

11 3 as it relates to an adverse employment action as a result of

12 discrimination.  Here, there's only an allegation that he was

13 constructively discharged to us -- by us.  There's no

14 allegation that plaintiff ever communicated any decision to the

15 defendant that he was quitting or resigning because of

16 discrimination.  That's not in complaint.

17         THE COURT:  Well, he didn't want to quit or resign.

18 He wanted to keep his job, right?

19         MR. GILLIGAN:  Well, but there's no email or

20 allegation that even if that was the case, that he was being

21 constructively discharged.  From our perspective, we made no

22 employment decision as it related to the plaintiff's

23 employment.  The plaintiff apparently, according to this

24 complaint, he was constructively discharged, however, even

25 though he's on long-term disability through the school.

1          THE COURT:  Well, is agreeing to place him on long-

2   term disability that he requested because he basically feels

3   that he had to, I guess, in order to go ahead and maintain some

4   level of income because he wasn't able to receive the

5   accommodations that he was seeking, what other recourse does he

6   have?

7          MR. GILLIGAN:  He could engage in the interactive

8   process with us and make a determination on whether or not we

9   could grant him the out-of-work remote accommodation that he

10  wanted.

11         THE COURT:  And so if your client knew that he would

12  have a flare-up every Wednesday or every fourth Thursday of the

13  month, that would be sufficient?

14         MR. GILLIGAN:  I believe that it goes a long way to

15  allow our client to be able to cover those classes that the

16  plaintiff would be unable to otherwise teach and be able to

17  provide a reasonable accommodation in that sense by getting a

18  substitute.

19         THE COURT:  And when the pandemic was ongoing, did

20  the school engage in remote instruction during that time frame?

21         MR. GILLIGAN:  I believe so, yes.

22         THE COURT:  And so the -- your client, the

23  institution, has the ability and capabilities to allow for a

24  virtual instruction process, correct?

25         MR. GILLIGAN:  It does.  But again, the ADA doesn't

1  require the employer give the employees preference as it

2  relates to a reasonable accommodation.  They are allowed to

3  choose what they believe to be the most appropriate reasonable

4  accommodation for them.

5          THE COURT:  "They" being the employer?

6          MR. GILLIGAN:  Yes.

7          THE COURT:  And what they were asking for is some

8  basis within which to consider that accommodation, and they

9  found that the basis that was provided by his physician who was

10 medically treating him and diagnosed him to be insufficient.

11 That's my impression and takeaway from your argument, am I

12 correct?

13         MR. GILLIGAN:  No.  I -- I -- Judge, to clarify, the

14 school's position was that it was not provided enough

15 information to determine why he was able to work remotely from

16 home in any capacity, whereas -- and I think that's the --

17         THE COURT:  So it was either come into work or you're

18 off and home and not working, but you're not getting remote,

19 correct?

20         MR. GILLIGAN:  Yes.

21         THE COURT:  Okay.  Remind me -- we're here on a

22 12(b)(6), not a summary judgment.  Remind me what the Court

23 should consider on a 12(b)(6) motion.  What's my standard of

24 review?

25         MR. GILLIGAN:  Well, in terms of what we've been

1   discussing today, we believe that the Court can consider the

2   allegations in the complaint.  And additionally, they can

3   consider the documents that we believe are integral and that

4   were left out or not attached to the plaintiff's complaint.

5   And that's citing to multiple cases from -- as it relates to

6   Schmidt versus Skolas, which is from the Third Circuit from

7   2014, or that's also for In Re Burlington Coat Factory

8   Securities Litigation, Third Circuit, 1997.

9         THE COURT:  And so the inferences that I draw from

10   the complaint should be drawn in favor of who?

11         MR. GILLIGAN:  It should be drawn in favor of the

12   plaintiff.

13         THE COURT:  Anything further, Counsel?

14         MR. GILLIGAN:  No, Your Honor.

15         THE COURT:  Okay.

16         MR. GILLIGAN:  Not at this time.

17         THE COURT:  Thank you.  Counsel?

18         MR. WOODSIDE:  Thank you, Your Honor.  Again, Stephen

19   Woodside from Mr. Davis, the plaintiff.

20         I want to do a couple of things here this morning in

21   my argument.  I know that Your Honor got to some of the core

22   issues with questions to counsel, but I want to go back a

23   little bit and explain a little bit more about the standard

24   that applies here, and then working off the standard, which I

25   will cover at the end.  I want to cover the medical side of

1  this case just a little bit, and then address with the Court

2  why that all of this evidence that is stapled to a

3  certification by Mr. Gilligan should not be considered on this

4  motion.

5          So Mr. Davis is diagnosed in June of 2022 with

6  multiple sclerosis.  It's a lifelong condition.  It's chronic.

7  It goes in remission.  It exacerbates.  There are a variety of

8  symptoms that accompany this, and I don't want to go into all

9  of it.  But he had a diagnosis, told the school on August 28th,

10 2022 that he had this diagnosis.  And he knew -- he told the

11 school at that time he was going to need accommodations in

12 order to come back for fiscal year teaching 2022-2023.

13         He explained to the court [sic] clearly, and then it

14 was later followed up very promptly by a medical report that he

15 needed to be off work to treat, and he had trouble walking,

16 sitting, and standing, and extended hours would exacerbate the

17 condition.  So we have an intermittent type of situation

18 medically.  When it flares up, it's painful, and he can't get

19 around at all, and he's on medicine.  When it goes in remission

20 for long periods of time, he's perfectly fine.

21         So the first piece of evidence that this college --

22 he worked for the college, not the military academy.  There's

23 two pieces to Valley Forge.  He was a full professor at the

24 college.  Background in criminal science, criminal and

25 constitutional law.  He was a retired sergeant with a

1   Philadelphia Police Department, I think in District 38.  So he

2   knew what he was doing at the school, very well-qualified, and

3   essentially well-grounded for the school to move forward

4   academically to get its accreditations.  All of that's in the

5   complaint.

6           On August 30th, 2022, Dr. Schindler, his neurologist,

7   provided a report.  And Dr. Schindler's report was: impaired

8   ability to work; need time off; he's going to have to treat;

9   he's got a four- to eight-week period where he's going to have

10  to treat and get this under control, get the multiple sclerosis

11  under control.

12          He -- then, again, in the same letter, there was a

13  statement made that plaintiff requested reasonable

14  accommodation and he also requested disability forms that he

15  might have expected to have filled out.

16          The college itself provided the paperwork for FMLA,

17  and that was provided under a medical certification at the end

18  of September of 2022.  The FMLA paperwork, which is extrinsic

19  to the case, but does bear on the issue pleaded or the facts in

20  the complaint.  It doesn't make it integral, and doesn't make

21  the complaint based on it, but I will discuss it since it's in

22  front of the Court today.

23          The FMLA paperwork was very clear.  Plaintiff could

24  not stand for more than three hours a day, he could not work

25  five days a week.  He could teach one or two days in class, in

1  person.  The remainder, he might have to teach remotely.

2  Again, we're early on in this diagnosis and this treatment.  He

3  would need a reduced schedule to attend medical appointments.

4  That's all clear.  And the MS was, of course, prone to flare

5  ups.  And this was discussed on September 8th, 2022 with the

6  college.

7         And, again, the FMLA appears to have been approved on

8  September 26th, 2022, as well.  And that -- the college had

9  that paperwork, as well.  So by this point in time, the college

10  had FMLA paperwork describing the diagnosis, the prognosis, the

11  intermittent nature of the flare-ups, and what accommodation

12  would be required in order to allow Mr. Davis to do his job.

13  And the reports are all clear that Mr. Davis could have a good

14  quality of life once he gets the treatment underway, and once

15  he gets his accommodation for remote work or not working at

16  all.

17         Mr. Davis's position was he wanted to come back to

18  work, but if he had a flare-up, he would work remotely.

19         Jumping ahead a little bit, this college had a very

20  state of the art room for Mr. Davis to teach into the college

21  from his home, which was there as a result of COVID-19.  And

22  the college was totally COVID-prepared, and did all of its

23  academic work remotely with their teaching.  And that room is

24  still there today, I'm sure, but it was there in 2022 when Mr.

25  Davis wanted to come back to work, and it was never offered to

1  him.  The college never said to him, that room that you taught

2  through, and others taught through, as well, is here for you,

3  and based upon how you go through the fall of 2022, that's your

4  classroom if you can't get to work.  And all we need -- you

5  know, there was no discussions more about the remote, because

6  even though the doctor wrote about it -- Schindler wrote about

7  it on November 16th, 2022 when the plaintiff said he's ready to

8  come back to work.  On November 17, he is ready to come back,

9  but the symptoms could develop which would impair his ability

10  to work.  Dr. Schindler wrote this on -- and it's in the

11  complaint.  This was pleaded in the complaint.

12          The fact that I pleaded a fact about what a doctor

13  says doesn't make the report or the underlying medical integral

14  to the complaint, and that's case law.  I think the case law

15  concerning when a piece of evidence comes in is based upon is

16  it a matter of public record, are you relying on a contract

17  that might demonstrate that you have a statute of limitations

18  problem in your case, and you shouldn't be in court at all.

19  That's the kind of thing that this extrinsic evidence seems to

20  be pointing to in this case.

21          There was another case that Mr. Gilligan cited in his

22  reply brief, I'm going to address it in a couple of minutes,

23  but that holds in our favor, as well.

24          So I've got Dr. Schindler telling the school on

25  August 16th, 2022 that he can -- Mr. Davis can have a good

1  quality of life, but the accommodation that the doctor pinned

2  down for this college was, Mr. Davis will have to work remotely

3  or be excused from work if the symptoms arise.

4          So we have a condition medically, which is frequent

5  with a lot of medical conditions, we just can't pinpoint when

6  you get a flare-up, how long the flare-up might last.  But Mr.

7  Davis's position is that work from home -- or that -- I don't

8  want to say work from home.  It's a remote arrangement where he

9  can be set up to teach effectively.  He did it during COVID.

10 Everybody else did it during COVID.

11         In fact, as pleaded in the complaint, there's two

12 female faculty members right now who teach remotely using that

13 classroom.  The college has every capability to have provided

14 it.  For some reason, they weren't going to provide it, and

15 they never said that you've got your remote classrooms, Mr.

16 Davis, come on back to work; your doctor cleared you to work.

17         So in response to the college's -- and we're still at

18 the human resources level at the college, Ms. Penny Van --

19 whatever her name is -- sent a letter to Mr. Davis, again,

20 starting to get into the form letter routine about "we need

21 more information about you.  You're going to have to give us

22 more information."

23         Dr. Schindler wrote another report on November 29th.

24 This is our third report.  Dr. Schindler describes the

25 diagnosis and the symptomology.  He says the intermittent

1  nature of the condition is going to require a remote -- a work

2  remotely arrangement if you get the flare-up.  If you're not

3  flared up, go to work.  You can work and you'll have a good

4  quality of life.

5        So now we move into -- this is all in the complaint,

6  by the way.  There was -- when he was -- when Mr. Davis was

7  ready to come back to work, the complaint pleads -- and this is

8  to be considered true for purposes of the 12(b)(6) motion.  The

9  college never offered a classroom.  They never offered Mr.

10 Davis an office, even though there was one right where he could

11 have worked.  They never gave him a handicap parking spot.  And

12 they never gave him any other accommodation, and they never

13 offered him remote work when you have a flared up condition and

14 you can't come to work.

15       So they knew -- the university -- the college,

16 rather, knew about this history, and I think it's important to

17 point out to the Court and the record that, although this

18 extrinsic evidence is something that the complaint is not based

19 on and, therefore, it doesn't become integral to the complaint

20 because it wasn't explicitly relied on in the complaint.

21 Although Dr. Schindler's statements are opinion, and they are

22 relied on to demonstrate that the college knew about his

23 disability; they had the ability to accommodate; that Mr. Davis

24 asked for the accommodation; the college didn't give the

25 accommodation.  Therefore, Mr. Davis didn't come back to work

1 because the college didn't provide the accommodation under

2 which he could return to work.

3         But the college knew every single detail about Mr.

4 Davis's medical history as of September 23rd when Dr. Schindler

5 wrote this first letter.  And it's -- there was a very detailed

6 progress note in the extrinsic evidence.  Not that I'm waiving

7 my position about the 12(b) because it shouldn't come in, but

8 just for purposes of demonstrating that the argument made by

9 the college has absolutely no merit.

10         The things that are written in this progress note

11 about Mr. Davis are very explicit about what his limitations

12 are.  I'll give the Court just a couple of examples from this.

13 When he is on his feet for a time, his feet hurt, his back is

14 painful, his right hand is painful.  He saw Mr. -- he saw the

15 doctor on September 23rd.  The doctor wrote in a progress note,

16 "Mr. Davis continues to have evolving symptoms including pain,

17 particularly when he is on his feet, such as giving lectures.

18 This then leads to worsening back pain.  He also has painful

19 dysesthesias in his right hand.  He has endorsed -- the stress

20 can trigger and worsen -- worsen with his symptoms.  He has

21 tried a variety of medicines for -- for symptomatic."

22         In the interval history which led into the hiring or

23 getting the neurologist to treat, he demonstrated motor

24 weakness on exertion; ambulation is painful and slow; energy is

25 equivalent to fatigue; and he has tonic spasms which are

1  intermittent.

2          And all of this is very detailed in here.  I have no

3  idea why the college would ever be making any argument that

4  they don't understand what Mr. Davis was suffering from -- from

5  -- in the context of the accommodation that was asked for, both

6  by Mr. Davis and recommended by his treating neurologist.  And

7  also it's set forth in the FMLA paperwork, again extrinsic to

8  the case, it doesn't need to come in.  And, again, also in the

9  disability information which Mr. Davis had no choice but to

10  file for.  So let --

11          THE COURT:  When was that information provided to the

12  college?

13          MR. WOODSIDE:  Well, I didn't -- just so I'm clear

14  here, Your Honor, on the argument.  Nothing about the

15  disability policy, or the disability position, or the

16  disability claim was ever pleaded in the complaint.  I can be

17  very clear that you can be -- if you don't receive your

18  accommodation, and you're not able to work because the

19  accommodation was denied, Mr. Davis can be -- can be declared,

20  under some other contract about addressing his medical problem

21  as to whether he's disabled or not, he -- Mr. Davis could be

22  disabled all day long because he's not getting a work

23  accommodation and get the benefits that some insurance company

24  says he's entitled to, but that does not foreclose a claim

25  against the college for not providing the accommodation which

46

1  was available to him.

2          So whether Mr. Davis is getting a disability benefit

3  or payment or not is not integral to the complaint.  It wasn't

4  pleaded.  Nothing about the -- this was pleaded in the

5  complaint.  That would be a topic for an answer in affirmative

6  defense, and briefing, and even perhaps discovery.  And if the

7  college thinks that the carrier has information that might bear

8  on the fact that it doesn't matter whether we denied you an

9  accommodation or not, you can't work, they can go subpoena the

10  carrier, and everybody can just do their discovery on the

11  point.

12          It's not in the complaint, Your Honor.  And

13  therefore, just to --

14          THE COURT:  But my pointed question is when -- what

15  you just provided to me that you read, just a bit of an

16  excerpt, when was that information provided to the college?

17          MR. WOODSIDE:  Let me see if --

18          THE COURT:  In terms of his feet hurting.

19          MR. WOODSIDE:  Oh, that --

20          THE COURT:  Standing for long periods of time.

21          MR. WOODSIDE:  That --

22          THE COURT:  When was that provided to the college?

23          MR. WOODSIDE:  That was provided to the college on

24  September 28th -- if I can go back to it.  It was -- it was

25  provided on -- these are progress notes from Mr. Davis

47

1  identifying what his status was on September 23rd, 2022.  So we

2  have a very serious designation of the symptomology, the

3  diagnosis, the prognosis, and the pain, and all the things that

4  go with MS.

5       And the critical point, though, Your Honor, is that

6  on November 17th, 2022, after Mr. Davis had his neurological

7  treatment, got his medicine under -- you know, arranged, and

8  taken, and prescribed, he notified the college he was ready to

9  come back to work; November 17th.  So it was that date that,

10 not only had the accommodation request for virtual work

11 remotely been made months prior, but now we're at a core point

12 in this case where Mr. Davis, again, with his doctor supporting

13 it, saying I want to return but I'm going to have flare-ups,

14 and symptomology, and I might not be able to come in.  On the

15 days that I can't come in, I should be able to teach remotely,

16 like all the faculty did during the COVID year, and maybe for

17 the year after, too.

18      So that was in September, I don't --

19      THE COURT:  Okay.

20      MR. WOODSIDE:  There was -- there was -- all right,

21 well, I'm just going to cover this a little bit more.  There

22 was an assessment and plan for Mr. Davis in this medical record

23 and notes -- progress notes, which I think are Dr. Schindler's

24 work-up.  We discussed how stress can make MS symptoms worse,

25 and that we can -- we agreed that workplace accommodations

1 should be in place to minimize stress.  We discussed getting

2 his diagnosis and several risk factors to more a aggressive

3 disease, so it doesn't -- you know, that's in a -- that's a

4 plan where Mr. Davis was not ready to come back to work yet,

5 but there's a pretty serious assessment that stress is going to

6 bring this on.

7        And also, in-classroom teaching, which is on your

8 feet -- I've never seen a professor sit down and teach a class

9 in front of students.  This is a military college.  I'm sure

10 the decorum is stand up, teach, you're on your feet.  And

11 there's already serious limitations on Mr. Davis's ability to

12 work under the setting that they may have required.  But he was

13 perfectly able to do this job with a virtual remote work

14 teaching room, which was there at the college, and Mr. Davis

15 had done it before for over a year.

16        Let me move forward to the -- getting the -- the

17 complaint pleads also, that the college never considered

18 whether the impact of virtual or remote work accommodations was

19 outweighed by any essential function of his job that required

20 an on-campus presence during the flare-up.  So even though the

21 request for virtual work was made through physicians, the

22 treating neurologists and Mr. Davis himself, the college never

23 undertook the accommodation process where they have to weigh

24 and balance what the cost of this might be to us versus whether

25 or not, even if I provided it to you, you still can't do the

1  job.  They never undertook that analysis.  The Code of Federal

2  Regulations require that to be done.

3          The college never also in -- if they didn't want to

4  provide the virtual remote or a teaching environment, they

5  never provided any alternative accommodations for Mr. Davis to

6  return either.  The complaint pleads: I didn't have a

7  classroom.  I didn't have an office.  There had been a vacant

8  office right near a classroom that might have been useful to

9  him.  He needed a handicap parking spot, obviously; they never

10 offered that.  And they never said to him, "Come back to work,

11 Mr. Davis, we have you set up.  And if you don't come back to

12 work, you're not going to have a job."  They just ignored him.

13         And on some of this extrinsic evidence, Mr. Gilligan

14 was pointing out that there's a batch of letters between a

15 lawyer named Eric Shore, or that law firm and the college; I

16 wasn't involved in the case back then.  Those -- whatever those

17 lawyers are writing about, they're taking one position versus

18 Mr. Davis over the college's position versus Mr. Davis, again,

19 written by Mr. Gilligan's law firm.

20         So as soon as the lawyers are involved, suddenly

21 you've got a different dynamic.  You have a different --

22 everybody's positioning themselves about "what's going on with

23 your accommodation, Mr. Davis?"  And so those -- I wasn't

24 involved.  I might have handled it differently back then than

25 that law firm did, but the evidence shouldn't come in anyway.

1  And I don't think it bears on anything going on in the case in

2  this complaint that we're -- we're -- the framework is the

3  complaint.

4         So let me talk about the standard on 12(b)(6).  And

5  when this kind of evidence can come in, and maybe even should

6  come in, the Court's well aware of the standard.  I don't want

7  to really go through the boilerplate on this, but the Court

8  here on this motion is not obliged to apply any different

9  standard under 12(b) that I'm aware of.

10        The Court takes note of the elements that plaintiff

11 must plead to state his claim.  I got one claim for ADA.  The

12 Court must identify the allegations and their mere conclusions

13 and not consider those.

14        And then the Court will assume the veracity of the

15 well-pleaded facts and determine whether they plausibly give

16 rise to entitlement to relief.

17        The standard is always facial plausibility.  And case

18 law controls this in a way, of course, favorable for the

19 plaintiff because it's at the pleading stage under Rule 8.  But

20 it just simply calls for enough facts to be pleaded to raise a

21 reasonable expectation that discovery will reveal evidence of a

22 necessary element.

23        Now, my -- the plaintiff's position is the complaint

24 is extremely well-pleaded and very articulate and justiciable

25 for the ADA claim.  But Mr. Gilligan seems to think that it's

1  not.  If we consider his -- the college's extrinsic evidence,

2  the complaint will collapse and totally fail.  So it works --

3  it doesn't work from the standpoint that Mr. Gilligan gets an

4  early head start on the complaint by trying to shove into that

5  complaint things that Mr. Gilligan -- or his client, rather,

6  think that the plaintiff left out.

7        We are on the four corners of the complaint.  Facial

8  plausibility is simply where the -- and this is -- case law is

9  where the plaintiff pleads enough facts that allow the Court to

10 draw the reasonable inference that defendant is liable for the

11 misconduct.

12       So I've got facial plausibility that is tied to

13 reasonable inferences.  As long as I have facts that plead the

14 cause of action in a way that is -- are considered to be

15 truthful, then the rest of it falls into the process of, you

16 know, factual discovery, and what expert witnesses are you

17 going to bring in, and what are the college's defenses?  And

18 they have every right to plead every single defense that I've

19 heard here today that they think might be viable.

20       So then -- so then the issue of extrinsic evidence

21 comes up in the context where the complaint itself is based on

22 a document.  Now here, it gets a little fuzzy in here, but I

23 was trying to read the cases again last night.  To be based on

24 the document, the document must be integral or explicitly

25 relied on in the complaint.  In other words, I'm suing an

1  insurance company, and I've got a contract for my coverage, and

2  I reference the contract in the complaint, I cited provisions

3  in the contract, and without that contract I don't have a cause

4  of action.  So I'm -- just by what an example.

5         So I don't attach the contract to the complaint, but

6  if I did, it would demonstrate -- let me -- outside the statute

7  of limitations, I'm not a covered employee, I could never be

8  covered, I don't have -- the policy is not -- it doesn't exist,

9  it was termed.  Something really general where the contract is

10  integral to the complaint.  And that's not this case.

11         None of the documents that are presented here by the

12  college are a matter of public record.  The Court can't take

13  external judicial notice of any of it.  There isn't anything

14  about any of those documents that the complaint actually

15  pleaded, except maybe the three Schindler reports.  However,

16  simply because the report would address a factual issue doesn't

17  make it integral.

18         So the integration element is a little more than just

19  pleading that Dr. Schindler said something, or plaintiff said

20  something, or the college didn't do something.  Integral means

21  that it's so basic to the complaint that without it, you don't

22  have a cause of action.  That's the only way I can really see

23  that.

24         This situation about -- counsel raised about

25  misrepresentation of facts in the complaint.  The only -- let

1  me just look at this.  Counsel raised in the complaint a

2  paragraph that counsel has to take out of the context in order

3  to try to show that me, as a lawyer -- and I've never been told

4  ever by another lawyer in a complaint that I violated Rule 11,

5  or I did something wrong, or I pleaded something incorrect.

6  But let's just give Mr. Gilligan the benefit of what he's

7  saying here, and then I'll show the Court what the complaint is

8  really doing here.

9           Paragraph 59, "The college never responded or

10 followed up with plaintiff to address Dr. Schindler's letters

11 and never offered, in fact -- and, in fact, refused -- refused

12 the remote virtual work accommodation recommended by Dr.

13 Schindler and requested by the plaintiff."

14          All right, so counsel seems to think that somehow

15 that is a complete fabrication.  I think the word was "charade"

16 or a misrepresentation to the Court.  That paragraph addresses

17 the two paragraphs above where Dr. Schindler in his report on

18 November 29th, 2022, the treating psychiatrist [sic] in his

19 supplemental letter wrote about the symptoms, they come and go,

20 they are lifelong and could be -- and they intermittently come

21 and go.

22          And then in Paragraph 58, plaintiff pleads, "Dr.

23 Schindler reiterated."

24          So, again, the complaint is pleading what Dr.

25 Schindler said.  The report is not integral to the complaint.

54

1  But even if it is, it was cited correctly due to Mr. Davis's

2  medical -- I'm paraphrasing all of it -- "Due to Mr. Davis's

3  medical condition, Mr. Davis is prone to develop symptoms which

4  may temporarily impact his ability to work.  We ask for him to

5  be able to work remotely, or be excused from work if these

6  symptoms arise.  We believe the accommodations will allow Mr.

7  Davis to perform all job duties while maintaining a good

8  quality of life."  Those are the two paragraphs that preceded

9  the allegation where the college never responded or followed up

10  to address Dr. Schindler's letters.

11        In the context of never providing the remote

12  work/virtual work environment for Mr. Davis, and then all of

13  the other things that the complaint says were not provided

14  either, that's what is stated in that paragraph, and that's

15  true.

16        So I don't know how -- I -- I'll leave it at that.

17  That is -- the only place I can see where there could be a

18  misunderstanding about what plaintiff was pleading in this

19  complaint -- and then, again, I went into -- plaintiff went

20  into back in September, they offered a golf cart but it was

21  never -- no golf cart was ever offered to Mr. Davis.  He didn't

22  ask for it.  A new classroom office at McMaster One.  He never

23  got a new classroom at all when he was coming back to work.

24  This is back when Dr. Schindler was involved first in September

25  of -- 23, 2022.  So none of these were ever provided to the

1 plaintiff.  And they could have been without any cost, or a
2 nominal cost.

3        So going back to the standard on extrinsic evidence,
4 and when it is coming in.  For even this evidence to be
5 appropriate or necessary for the Court, it has to -- the
6 complaint has to be based on it in such a way where if I took
7 it out of the complaint, I would not have a cause of action.  I
8 think that might be a better way to look at it.

9        But in this complaint here, no disability policy was
10 ever pleaded.  Aside from referencing Dr. Schindler's three
11 reports and the fact that Mr. Davis did apply for FMLA, and did
12 eventually get a disability benefit because he had no other
13 income, none of the -- none of this extrinsic evidence is
14 material under the standard as an integral piece of the
15 complaint.  And -- the complaint is certainly not based on it,
16 and it's not explicitly identified in the complaint.

17        The -- I want to just look at these exhibits briefly.
18 I don't want to look at them in too much detail, but let me
19 just categorize this for the Court because I did it in my
20 brief, as well.

21        Exhibits -- this is in the Mr. Gilligan -- this is
22 Mr. Gilligan's certification.  I do not know how a lawyer can
23 certify to documents between his client -- I don't see an
24 affidavit, and I do not see anybody certifying that these
25 letters, or whatever they are, or emails are true and correct,

56

1   and anything else.  There is Rule 11 applying to this, as well.

2           But let me just move through the exhibits.  D, F, G

3   and J, it's Document 4-3.  These are -- this is one email and

4   letters between Valley Forge and the plaintiff that address the

5   attempt to get -- to reach reasonable accommodation and/or why

6   I'm not getting it, and that this is what I am entitled to.

7   And there's the college saying, we're not -- you know, we're

8   not -- we need something more or you are not getting it.

9           Then Exhibits K, M, N and O are letters and one email

10  between Valley Forge, the college's lawyer, and plaintiff's

11  counsel, my predecessor counsel, Eric Shore.  I wasn't involved

12  in any of that.  These are letters between attorneys.  Again,

13  once lawyers are involved, and they start positioning between

14  their parties and start to stake out their divergent

15  viewpoints, all you get are questions of fact and arguments,

16  and you don't reach any conclusions whatsoever about anything.

17  If the college is not going to give the accommodation to Mr.

18  Davis when he is asking for it, they're certainly not going to

19  turn it over to lawyers when they are involved.

20          The emails between Valley Forge and plaintiff

21  directly are simply expressions -- from what I looked at, were

22  Valley Forge's own viewpoints about the plaintiff, and what

23  Valley Forge was claiming it needed from the plaintiff after

24  plaintiff already said that I provided you with an FMLA

25  certification; I provided -- you have the disability

1  information on me, you have detailed records about my medical

2  condition; and the need for the accommodation of the remote

3  work environment and classroom so I can come back to work.

4         The other sheets, Q -- Q and R.  R is a cover page on

5  an insurance policy.  And as I wrote in my brief -- I

6  articulated in my brief that there isn't anything in this

7  document that identifies anything from Mr. Davis about what's

8  required in order to obtain a disability; what Mr. Davis's

9  conditions are.  I don't even see Mr. Davis's name on any of

10 this.

11        THE COURT:  Well, that was going to be my question.

12 So how can that be authenticated?

13        MR. WOODSIDE:  It can't.  Well, it can't -- well,

14 counsel -- I didn't -- counsel authenticated it with a

15 certification.  But standing alone, this is a couple sheets of

16 a disability policy when the plaintiff himself did not plead

17 anything about a disability benefit as being something that's

18 important to his claim to begin with.  So we're off the rail on

19 that.

20        The earlier exhibit, which is Q, it looks like -- it

21 looks like -- well, I don't know what it is.  It looks like a

22 computer screenshot of redacted information about something

23 concerning Mr. Davis's employee history, but -- and it may be

24 his LTD claim record.  But, again, none of it is pleaded in the

25 complaint.  None of it would be deemed to be integral to the

1  complaint, therefore, since the complaint's not based on it,

2  and it's not expressly pleaded, or even identified.  So I don't

3  know what this information is.

4          THE COURT:  So, Counsel, is it your position that all

5  of the exhibits that were attached and provided and certified

6  by opposing counsel are not integral to this, and they all

7  qualify as being extrinsic and, therefore, should not be

8  considered by the Court?

9          MR. WOODSIDE:  That is plaintiff's position.

10          THE COURT:  Okay.

11          MR. WOODSIDE:  A, I think, was the complaint.  No

12  objection to the complaint.

13          I think that B might have been the EEOC charge.  The

14  Court can take judicial notice of the charge.  I'm not

15  objecting to the EEOC charge.  But Exhibits B through R, all --

16          THE COURT:  Well, you said A and B.  B would be the

17  EEOC charge; A is the complaint.

18          MR. WOODSIDE:  Yes.

19          THE COURT:  Are we talking about C through R?

20          MR. WOODSIDE:  C through -- yes, I'm sorry.

21          THE COURT:  Okay.

22          MR. WOODSIDE:  C through R, all extrinsic to the

23  complaint under the controlling standards of law that apply to

24  this case, and I don't see any case law that changes anything

25  about how the Court would rule on this.

1          I've covered -- there's a case that Mr. Gilligan

2     cited, and I read it this morning.  It's the <u>Schmidt v. Skolas</u>

3     case, cited at 770 F.3d 241, U.S. Court of Appeals, Third

4     Circuit.  It's a complicated commercial case involving a breach

5     of fiduciary duty.  It's a derivative shareholder action, and

6     there's a lot of defendants.  And there, the Third Circuit

7     reversed the District Court, this Eastern District Court, on

8     the fact that the Court considered affidavits to be non-

9     extrinsic when the Third Circuit felt that they were, and they

10    should not have been considered.

11         And secondly, there were press releases that were

12    used or attempted to be relied upon as extrinsic evidence on a

13    12(b)(6) motion.  And the lower court in this District allowed

14    it.  The Third Circuit reversed, and said it's not integral --

15    that press releases are not integral to the complaint.  The

16    complaint was not based on the press releases or any updates

17    from the Genaera Corporation.  They're not records of a

18    government agency.  They're not a matter of public record.

19         And, thirdly, there was an attempt to use extrinsic

20    evidence in the lower court, it was successful to dismiss a

21    complaint; the Third Circuit reversed.  And that evidence was

22    website postings.  They wanted to take judicial notice of press

23    releases and website postings to -- and this is -- and, again,

24    this is in the context of notice.  What did these -- what did

25    these defendants know -- I'm sorry.  What did the plaintiff

1 know, or should have known, when he was drafting the complaint

2 about what the defendants knew about the fiduciary duty being

3 breached, and on, and on, and on?  It's a little -- it's a

4 little lopsided here.

5        But there, there were website postings and the

6 allegation was they -- that they must have been used to frame

7 the complaint, and plaintiff should not be able to evade

8 accountability for the documents.  But the District Court was

9 reversed on that by the Third Circuit, as well.  Reliance on

10 the press releases and the updates from Genaera Liquidating

11 Trust was improper.

12        So the complaint went back on a 12(b)(6) on a

13 dismissal.

14        I don't have anything further, Your Honor, unless you

15 have questions of me.

16        THE COURT:  I have one question for you, Counsel.

17        MR. WOODSIDE:  Sure.

18        THE COURT:  Your motion to -- your cross-motion to

19 strike --

20        MR. WOODSIDE:  Yes.

21        THE COURT:  -- that you stated in your brief under

22 12(f), my question is seeking clarity on whether or not a 12(f)

23 motion is applicable on a motion, or is it restricted to being

24 applicable only on a pleading?

25        MR. WOODSIDE:  Yeah.

1          THE COURT:  Do you have a position on that?

2          MR. WOODSIDE:  I do.

3          THE COURT:  Or can you give me a response on that?

4          MR. WOODSIDE:  I briefed this as succinctly as I

5    could at Page 17 --

6          THE COURT:  Yes.

7          MR. WOODSIDE:  -- 18 and 19.  And I cited the case

8    law that generally 12(f) is directed at pleadings, not motions.

9          THE COURT:  Correct.

10          MR. WOODSIDE:  However, we're dealing with a 12(b)(6)

11   motion here.  So once a party -- and here, the defendant --

12   attempts to use extrinsic evidence to defeat my complaint, the

13   pleading at issue is the complaint.  So if we have an attempt

14   to use the evidence to defeat the complaint, my argument --

15   plaintiff's argument is that equivalently to use it to defeat

16   the complaint where that does not succeed should allow the

17   plaintiff to then move the Court under 12(f) to strike that

18   evidence because it was not considered; it was not deemed to be

19   extrinsic to the complaint; not a part of the complaint.  And,

20   therefore, it shouldn't be in the docket and on the record at

21   this point in the case.

22          Some of it might have been redacted as medical, I'm

23   not positive.  I haven't checked the docket in a while.  But I

24   did cite cases in my brief that the Federal Judges have

25   inherent power to manage cases before them, and I think the

1  Court here has a good understanding that Your Honor has the

2  power to manage this case effectively from the standpoint of

3  barring the extrinsic evidence.  And the Court may consider

4  motions that a party captions a motion to strike that are

5  different in kind than motions that Rule 12 contemplates, and

6  there's a -- there's case law cited, as well as on that

7  particular point.

8          So I believe my argument is Your Honor has the power

9  to do it.  It's at the Court's discretion as to whether the

10 Court wants to consider the fact that the attempt at this

11 evidence is so intimately tied to the complaint itself that the

12 motion to strike could be granted under the authority in my

13 brief.

14          THE COURT:  Understood.  I --

15          MR. WOODSIDE:  All right.  That's --

16          THE COURT:  I definitely appreciate the way you've

17 stated it and understanding --

18          MR. WOODSIDE:  All right.

19          THE COURT:  -- kind of the interwoven nature of the

20 decisions --

21          MR. WOODSIDE:  All right.  That is --

22          THE COURT:  -- that I need to make insofar as, you

23 know, defense motion to dismiss, and hence your cross-motion to

24 strike, and one potentially, in essence, being outcome-

25 determinative of what I need to render insofar as your motion

1  to strike is concerned.  That's the only question I had beyond

2  that.

3          MR. WOODSIDE:  All right.  I --

4          THE COURT:  So --

5          MR. WOODSIDE:  That's all I have for you, Your Honor.

6          THE COURT:  Thank you.

7          MR. WOODSIDE:  Thank you.

8          THE COURT:  Counsel, your response.

9          MR. GILLIGAN:  Just real briefly, Your Honor.

10         THE COURT:  And I will highlight for you as you are

11 doing it briefly, anything on the extrinsic evidence component

12 would be appreciated.

13         MR. GILLIGAN:  Sure.  Let me -- well, let me start

14 with that then.  Again, we believe the documentation that we

15 cited in support of our motion is integral.  We cited <u>Schmidt</u>

16 <u>versus Skolas</u>.  The issue here is actual notice.  The plaintiff

17 had actual notice of the documents that we sent.

18         In this other case that counsel is now trying -- that

19 counsel is now trying to paint a picture that websites or press

20 releases were denied by the court.  However, again, the issue

21 is his actual knowledge and notice of the documents that we

22 provided.

23         In essence, these are plaintiff's medical documents

24 and communications between plaintiff's own lawyer, which are --

25 that they clearly had knowledge of and should be considered as

64

1  integral to the complaint.

2          Again, this is a single count disability

3  discrimination claim under the ADA.  The plaintiff's medical

4  documentation and the communications regarding same are

5  integral to the complaint.  Plaintiff's counsel made an

6  argument about an insurance case, and about whether the

7  contract would be essential or integral.  We argue that medical

8  certifications and communications regarding the accommodations

9  necessary are integral.  It's the same analogy.

10          As it relates to, again, whether or not plaintiff

11 could be accommodated and the defendant's attempt to get the

12 information that it needed in further of the interactive

13 process, if you look at the FMLA certifications, they say

14 plaintiff can work in person.  That's what they say.  That

15 specifically, the November 8 -- or, the September 8th, 2022

16 FMLA certification by Dr. Peter Boutros Edde said that the

17 plaintiff could work in person.

18          We then have a different FMLA paperwork that says

19 that there will be no -- it says -- the question is "Will the

20 condition cause episodic flare-ups preventing the employee from

21 performing his or her job functions?"  The doctor checked,

22 "No."

23          So we have doctors stating that he can work in

24 person.  We have doctors stating, again, all the plaintiff's

25 doctors, stating that there will not be flare-ups.

1          All defendants wanted to determine was whether or not
2    plaintiff could work in person with certain accommodations.
3    And certain accommodations were offered.

4          And so it's our position that pursuant to the case
5    law, specifically Ruggiero versus Mount Nittany or Solomon
6    versus School District, that the communications by counsel to
7    determine what could be done to accommodate the plaintiff are
8    integral to the complaint and can be considered as such.

9          As it relates, just briefly, on the cross-motion to
10   strike, again, Your Honor is correct, Rule 12(f) is for
11   pleadings, not motions.  We don't believe that the cases cited
12   by plaintiff's counsel support his request.  And we believe
13   that for those reasons, that should be denied.

14         The last thing that I want to touch on is -- it
15   relates, again, to the complaint as it relates to Allegation
16   59.  Plaintiff's counsel states that 59 is only for the
17   doctor's letters, and about whether or not he could work
18   remotely, and that that is their position and as such, it's a
19   true statement.

20         However, the December 6th letter specifically asks,
21   quote, "Whether" -- "However" -- it states, "However, the
22   amended certification does not answer several of the questions
23   posed to your client in our November 18th, '22 correspondence.
24   Specifically," and I'll skip Number 1 and Number 2 just for the
25   sake of this, and Number 3, which states, "Whether permitting

1  Mr. Davis to work from home would allow him to teach with a

2  full course load." That is directly in response and in point,

3  and you cannot argue that the college never responded on the

4  issue about being able to work remotely.

5           And with that --

6           THE COURT:  I'm sorry, who cannot argue that?

7           MR. GILLIGAN:  That the complaint cannot allege that

8  the college did not respond on that position about whether he

9  could work remotely.

10          THE COURT:  Repeat the college's response.

11          MR. GILLIGAN:  The college specifically asked

12 plaintiff -- plaintiff's counsel, "Whether permitting Mr. Davis

13 to work from home would allow him to teach with a full course

14 load."

15          And it goes directly to the --

16          THE COURT:  And so that's the question posed by the

17 college --

18          MR. GILLIGAN:  Right.

19          THE COURT:  -- to counsel -- not current counsel, but

20 previous counsel for the plaintiff, correct?

21          MR. GILLIGAN:  Yes.

22          THE COURT:  And your --

23          MR. GILLIGAN:  Their response was nothing.

24          THE COURT:  You did not receive a response to that

25 question.

1              MR. GILLIGAN:  Right.

2              THE COURT:  And so the lack of a response, your

3   conclusion and argument, is that plaintiff was what?

4              MR. GILLIGAN:  That, again, that plaintiff -- as it

5   relates to 59, that 59 in the complaint cannot be correct.

6              THE COURT:  Because --

7              MR. GILLIGAN:  That the allegation is that the

8   college never responded or followed up with plaintiff to

9   address Dr. Schindler's letters and never offered and, in fact,

10  refused the remote virtual work accommodation recommended by

11  Dr. Schindler and requested by the plaintiff.  Plaintiff's

12  counsel, in his opposition --

13             THE COURT:  So there was a response.

14             MR. GILLIGAN:  There was a response.

15             THE COURT:  And the response was in the form of a

16  question.

17             MR. GILLIGAN:  And -- and multiple times, yes.

18             THE COURT:  Okay.  And we -- we -- I heard you before

19  on that, so I've got that clear.

20             MR. GILLIGAN:  Nothing --

21             THE COURT:  Thank you, Counsel.

22             MR. GILLIGAN:  Nothing further, Your Honor.

23             THE COURT:  I appreciate it.

24             MR. GILLIGAN:  Thank you.

25                          (Pause)

68

1          THE COURT:  I appreciate the argument of both of you,

2    Counsel, and the time you've taken.  And I think in reviewing

3    my notes and also your briefings, just a couple of things stand

4    out to me as being outstanding.

5          This is for you, Mr. Gilligan.  The question I have

6    is, do you believe that the plaintiff has to inform the

7    employer with specificity that they feel like they are

8    constructively discharged?  Is that something that you need to

9    be made aware of, or that your client should have been made

10   aware of prior to the filing of a complaint?

11         MR. GILLIGAN:  I believe that, yes, if the plaintiff

12   felt that they had been constructively discharged, they should

13   have communicated that to the school.  The school's position,

14   and I think as evidenced by the several letters that we've

15   pointed to here today, the December 6th, the December 20th, and

16   the January -- the January letter showed that the school was

17   trying to continue to engage in a good faith interactive

18   process.

19         And if the plaintiff was abandoning that, or felt

20   that he had been constructively discharged due to that process,

21   then further dialogue could have occurred.

22         THE COURT:  And so is there anything that requires

23   him under the ADA or otherwise to make that affirmative, I

24   guess, determination and articulate that to the employer in

25   order to move forward under his disability claim?

1          MR. GILLIGAN:  Yes, Your Honor.  We believe that

2   under <u>Ruggiero versus Mount Nittany</u>, and the quote that I cited

3   previously, it shows that a party -- and it states

4   specifically, I won't read the whole thing again, "a party that

5   obstructs or delays the interactive process is not acting in

6   good faith.  A party that fails to communicate by way of

7   initiation or response may also be acting in bad faith."

8          I believe that this case law supports our position

9   here.

10          THE COURT:  And so you will -- you would equate that

11  constructive discharge notification should have been given, and

12  it should have been given as part of the interactive process

13  because notification of being constructively discharged, or one

14  feeling that he or she is constructively discharged, falls

15  under the realm of potential discussions regarding reasonable

16  accommodations.  Am I right?

17          MR. GILLIGAN:  Right.  Because specifically, again,

18  it says "neither party should be able to cause a breakdown for

19  the purposes of either avoiding or inflicting liability."

20          I mean, from our perspective, again, the college was

21  trying to continue these discussions where the plaintiff was

22  not.  And so to be here today, now being sued for failing to

23  reasonably accommodate the plaintiff is exactly what <u>Ruggiero</u>

24  was talking about here.

25          THE COURT:  And once lawyers became involved in this

1  -- they were not involved at the point within which the

2  interactive process began, so when the plaintiff indicated that

3  he was able to return to work, his doctor provided that

4  information sometime in early November, and that kind of

5  interactive process was beginning, that both parties were

6  engaged in.  Do you believe that once attorneys became

7  involved, that somehow that shifted the interactive process, or

8  could the interactive process still have been ongoing at that

9  point?  And I'll have the same question for you, Counsel, as

10 well.

11           MR. GILLIGAN:  Sure.

12           THE COURT:  So, Mr. Woodside, I'd --

13           MR. GILLIGAN:  So, counsel was already involved

14 throughout that process.  So to pick a point in time and say

15 that, "well, now attorneys are involved," that's simply not the

16 correct point in time.  And I don't see, and I haven't heard

17 any case law, and I'm not aware of any case law, that supports

18 the proposition that once attorneys become involved, that would

19 end the interactive process.  I mean, for all intents and

20 purposes, under ethical obligations, our firm would not be able

21 to directly interact with the plaintiff in this case anyway.

22 And as such, the letters between counsel, especially once it's

23 known that he has counsel, and has represented that he does,

24 those communications have to go to his lawyer.

25           THE COURT:  So the involvement of counsel does not

1  preclude the interactive process.  As a matter of fact, they

2  may be part and parcel or participatory in assisting their

3  client in that process, correct?

4          MR. GILLIGAN:  That's correct.

5          THE COURT:  Okay.  And, Mr. Woodside, would you have

6  any differing position on that; same question?

7          MR. WOODSIDE:  Yeah, I do.  Again, in order to have

8  this argument to be meaningful, we have to consider the

9  extrinsic evidence, which is not integral to the complaint.

10          However, I want to address the first point that Your

11  Honor raised about the constructive discharge, whether notice

12  is something the employer should have or would be expected to

13  have before the plaintiff, in his utter frustration, realizes

14  he can't come back to work and is supposed to write some kind

15  of email or note saying, "you've constructively discharged me."

16  Constructive discharge is a matter of evidence, and a matter of

17  parties' testimony, and what went on between the two parties

18  when lawyers were involved in this case in December.

19          However, there's a case called -- I cited, Turner v.

20  Hershey Chocolate, USA, 440 F.3d 606, Page 16 of plaintiff's

21  brief.  An employee with a disability may establish a prima

22  facie case under the ADA if he can show he can perform the

23  essential functions of the job with reasonable accommodation,

24  and the employer refused to make such accommodation.  That

25  closes the claim.  The adverse employment action is in the --

1  under the ADA itself where the accommodation was refused.  And

2  whether or not there's some breakdown of the interactive

3  process, or all of the other things that the college is using

4  here to attempt to get an early defense of the case and dismiss

5  it in its entirety, all that's part of discovery.  So that is

6  the controlling case that Your Honor can also reference that

7  will show that the -- the ADA claim is closed and completed

8  with the fact that the college denied the reasonable

9  accommodation as pleaded in the complaint.

10         As regards what counsel was doing, again, I'm looking

11  at this extrinsic evidence, which really must be stricken.  But

12  Margolis Edelstein was involved in the case, writing to

13  plaintiff, my predecessor's attorney, Briana Pearson at the Law

14  Office of Eric Shore, you know, a long letter.  It's

15  essentially -- it looks to me like a letter that's obfuscating

16  the question about where is my remote accommodation; where is

17  my classroom; where's -- you know, it's not the question of how

18  many days a week I can teach.  Mr. Davis is ready to come back

19  to work, didn't get the remote learning accommodation, which

20  the college could have provided for minimal or nominal cost.

21         So this, Mr. Davis, I'm sure, probably told his

22  lawyer -- I don't know what he told his lawyer.  But his lawyer

23  wrote a letter.  This is where the lawyers are involved, and

24  there's a -- I think that might have been, you know -- there

25  was a December 20th letter by Pearson that says, you know,

73

1  we've provided the college with detailed documentation about

2  Mr. Davis's medical provider; why the accommodation is

3  necessary; the type of accommodation needed.  And the college

4  was now overextending itself and trying to get all of Mr.

5  Davis's medical records, and I don't know what was going on

6  with this attorney or what the thinking was.  I might have done

7  it differently, but it's --

8        THE COURT:  When was the complaint filed on this?  It

9  was December of 2022, correct?

10        MR. WOODSIDE:  Let me check.

11        THE COURT:  I believe December 16th.

12        MR. WOODSIDE:  It was -- I got May 23rd, 2023.

13        THE COURT:  May 23rd?  Okay.

14        MR. WOODSIDE:  Yeah.  The EEOC charge was filed on

15  December of 2022.

16        THE COURT:  Okay, the EEOC, got it.

17        MR. WOODSIDE:  And so that was served promptly on the

18  college, as well.  Mr. Davis ran out of gas, obviously, and

19  filed an EEOC charge, and then the complaint followed under the

20  statutory time periods --

21        THE COURT:  Yes.

22        MR. WOODSIDE:  -- that are applicable to that.

23        THE COURT:  Within the time frame within which they

24  received the right to sue notification?

25        MR. WOODSIDE:  Yes.  Yes.

74

1                THE COURT:  Okay.

2                MR. WOODSIDE:  And that's pleaded in the complaint,

3   as well.

4                THE COURT:  Yes.

5                MR. WOODSIDE:  That's all I have, Your Honor.

6                THE COURT:  Thank you.

7                And just one point on those dates.  For the December,

8   2022 filing with the EEOC, Mr. Gillian, do you believe that it

9   is appropriate, necessary, or expected, any of those, for the

10  interactive process to continue in light of a filing of an EEOC

11  charge?  Because I know that some of the correspondence from

12  your client to the plaintiff happened subsequent to that filing

13  of the EEOC where you're saying he was not responsive, he was

14  not engaging in an interactive process.  So is it your

15  expectation, your belief that he should have continued to

16  engage in it irrespective of the fact that an EEOC charge had

17  been filed in December, 2022?

18                MR. GILLIGAN:  So in our -- it is our perspective

19  that he should have.

20                THE COURT:  Okay.

21                MR. GILLIGAN:  He should have continued to engage

22  because he didn't plead in the EEOC charge that he had been

23  terminated by the school.  I mean, people file EEOC charges

24  over issues at work.

25                THE COURT:  So what did he plead?

1            MR. GILLIGAN:  Sure.

2            THE COURT:  So we won't worry --

3            MR. GILLIGAN:  Sure.

4            THE COURT:  We won't worry about other people.

5            MR. GILLIGAN:  I'll read the -- he said -- and it's

6  pretty short.  "On or about August, 2017, Valley Forge Military

7  Academy and College," quote, "'respondent,' hired Mr. Randy

8  Davis, Jr.," quote, "'complainant,' as an assistant professor.

9  Mr. Davis performed all duties asked of him without any

10  complaints or issues.  Mr. Davis has been requesting a

11  reasonable accommodation to no avail.  Unfortunately, VFMAC has

12  cultivated a work environment that has been overall

13  discriminatory.  As a result of FFMAC's [sic] unlawful policies

14  and procedures, Mr. Davis has suffered damages.  Mr. Davis was

15  also treated disparately in comparison to his Caucasian

16  colleagues.  The acts and omissions of the VFMAC's management

17  and agents violated the Pennsylvania Human Relations Act and

18  the Americans with Disabilities Act, inter alia."

19            So there's no allegation that he's been terminated.

20  And so, as I was saying, many employees file charges with EEOC

21  over workplace conditions, even if they -- if their employment

22  is still ongoing.

23            So from our perspective -- and this is why we sent

24  another letter after this asking for more information, was that

25  he -- that we were trying to continue the interactive process

1  because he could still return to work.  No determination

2  decision had been made and, as such, we believe the plaintiff

3  still had an obligation to continue in that process.

4           THE COURT:  And just last thing -- you can have a

5  seat.  This is not --

6           MR. GILLIGAN:  Sure.

7           THE COURT:  -- a question.  But what I note from that

8  filing is there's a reference to race in that with Caucasian

9  colleagues.  Mr. Davis -- and maybe you can clarify this, Mr.

10 Woodside, if he does or does not fit into that category.  I'm

11 basing it on what was filed with the EEOC, I would -- may draw

12 the conclusion or the inference that he is not Caucasian, but

13 there is no race-based discrimination charge in this.  So can

14 you clarify, Mr. Woodside, if I'm correct?

15          MR. WOODSIDE:  I can, Your Honor.  Mr. Davis is

16 African American.  His -- I didn't file that charge; prior

17 lawyers did.  Again, I might have handled it differently.

18 There is no Title VII claim for race discrimination in this

19 lawsuit, only ADA.

20          THE COURT:  Okay.

21          MR. WOODSIDE:  And that's what I see to be a very

22 justiciable claim here --

23          THE COURT:  Okay.

24          MR. WOODSIDE:  -- for the plaintiff.

25          THE COURT:  Thank you.

1          MR. WOODSIDE:  Thank you, Your Honor.

2          THE COURT:  Thank you both, Counsel.  I don't have

3  any further questions from either of you.  I appreciate, again,

4  your time.

5          If there were any cites to cases that are not

6  referenced in either of your briefs, I would like for those

7  cases to be provided to the Court, and I will ask that you

8  provide them to the Court a week from today.  So by next

9  Monday, which I believe, in my quick math, is the 22nd of this

10 month?

11         MR. GILLIGAN:  Yes, Your Honor.

12         MR. WOODSIDE:  Yes, Your Honor.

13         THE COURT:  And if those could be filed.  If those

14 are things -- I wrote down the citations of a variety of things

15 that you provided to me specifically, Mr. Gilligan.  But if

16 there's anything that was cited that is not contained in the

17 brief, if you would go ahead and provide it to the Court, that

18 would be appreciated.

19         MR. GILLIGAN:  Just a quick point of clarification.

20 Do you want that filed on the docket, or do you want that as an

21 email to chambers?

22         THE COURT:  It can be emailed to chambers.  You would

23 only have to file it if you're actually attaching some type of

24 argument with it.  I don't need an argument with it, or

25 anything supplemental, so it can be an email.

1              MR. GILLIGAN:  Thank you, Your Honor.

2              THE COURT:  Thank you.

3              MR. WOODSIDE:  Thank you, Your Honor.

4              THE COURT:  All right.  Gentlemen, I don't have any

5   further questions, as I stated.  And if there is no further

6   business before the Court, then we're going to stand adjourned.

7   Is there any further business from either of you?  Mr.

8   Woodside?

9              MR. WOODSIDE:  No, Your Honor.  I'm referencing,

10  though, the fact that in your order that ordered the oral

11  argument, a scheduling order would be forthcoming, and I just

12  want to -- I'd like to get moving, to the extent that the

13  Court's going to be adjudicating this motion at some time

14  period, we'd like to get that scheduling order, as well, as a

15  matter of housekeeping.

16             THE COURT:  Of course.  So depending on the outcome

17  and the decision I make in this, all other things will be moved

18  expediently.  If -- for the sake of today, if I do not grant

19  the motion presented, then all those things will be taken care

20  of in due course and very timely.  So I appreciate your

21  patience thus far in this.  And so I wanted to hear from you,

22  and have heard from you, and so things will move forward

23  appropriately based upon my decision on this case when I make

24  it.  Okay?

25             MR. WOODSIDE:  Thank you, Your Honor.

79

1          THE COURT:  Thank you, Counsel.

2          MR. GILLIGAN:  Nothing from me, Your Honor.

3          MR. WOODSIDE:  Enjoy your day.

4          MR. GILLIGAN:  Thank you.

5          THE CLERK:  All rise.

6      (Whereupon, at 1:00 p.m., the hearing was adjourned.)

7

8

9              CERTIFICATE OF TRANSCRIBER

10

11     I, KAREN HARTMANN, a certified Electronic Court

12 Transcriber, certify that the foregoing is a correct transcript

13 from the electronic sound recording of the proceedings in the

14 above-entitled matter.

15

16     *Karen Hartmann*

17

18 Karen Hartmann, AAERT CET 475  Date: April 25, 2024

19 TRANSCRIPTS PLUS, INC.

20

21

22

23

24

25